## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| PAULA COLLINS, | CASE NO. 5:23-CV-01235-DAR |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Paula Collins challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On June 23, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated June 23, 2023). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Collins filed for DIB on June 22, 2021, alleging a disability onset date of June 6, 2020. (Tr. 167). The claims were denied initially and on reconsideration. (Tr. 60-69, 72-81). Ms. Collins then requested a hearing before an Administrative Law Judge. (Tr. 99-100). Ms. Collins (represented by counsel) and a vocational expert (VE) testified on July 21, 2022. (Tr. 31-59). On August 1, 2022, the ALJ determined Ms. Collins was not disabled. (Tr. 14-30). The Appeals Council denied Ms. Collins's request for review, making the hearing decision the final decision of

1

the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Collins timely filed this action on June 22, 2023. (ECF #1).

FACTUAL BACKGROUND

## I.      Personal and Vocational Evidence

Ms. Collins was 52 years old on the alleged onset date and 54 years old at the administrative hearing. (Tr. 60). She received specialized training as a veterinary technician in 2007 and graduated from college in 2013. (Tr. 191). She worked as an emergency vet technician from 2007 to 2010 and became a high school teacher after graduation from college. (Tr. 209).

## II.      Relevant Medical Evidence

Ms. Collins has a history of blurred vision. (*See* Tr. 605). On July 18, 2019, Ms. Collins attended an eye examination and complained of tired eyes and blurred vision when reading. (Tr. 601). She denied symptoms of redness, pain, burning, and itching. (*Id.*). She reported wanting to try contact lenses again. (*Id.*). Jennifer Vincent, O.D., diagnosed myopia, regular astigmatism, and presbyopia and provided an updated prescription. (Tr. 604).

On November 10, 2019, Ms. Collins presented at the emergency department after a motor vehicle collision and reported left-sided head, elbow, knee, and rib pain worse with movement and somewhat alleviated by rest. (Tr. 503). Physical examination showed some tenderness of the left elbow, knee, and ribcage. (Tr. 505-06). Neurological examination was normal. (Tr. 506). A left knee X-ray revealed mild narrowing of the medial joint without spurring. (Tr. 575). An X-ray of the left arm was normal, without fracture or dislocation. (Tr. 577). A brain CT scan was unremarkable. (Tr. 583-84). Ms. Collins was discharged in stable condition with instructions to follow up with her doctor and take NSAIDs for her contusions. (Tr. 507).

2

Two days later, Ms. Collins met with Katherine Koczan, D.O., for a post-emergency room follow up visit where she reported light sensitivity, headaches, trouble reading for more than a few minutes, midline chest pain with deep breaths, dizziness, confusion, and trouble concentrating. (Tr. 501). Physical examination was normal. (*Id.*). Dr. Koczan referred her to a concussion specialist. (*Id.*).

On November 20, 2019, Ms. Collins consulted with neurologist Robert Kosmides, M.D.. (Tr. 497). There, she reported low back pain that is a little better with rest and chiropractic care, continued light and noise sensitivity, right sided pain with tingling in the fingers of both arms, vertigo, lightheadedness, short term memory issues, and bad dreams of the accident. (Tr. 497). Ms. Collins described teaching classes with the lights off and experiencing increased pain with noise. (*Id.*). She endorsed muscle, neck, and spine pain. (Tr. 499). Mental status and cranial nerve examinations were normal. (Tr. 499-500). Motor examination revealed some tenderness in the spine, and she displayed diminished stretch reflexes in the upper and lower extremities. (Tr. 500). Her gait was normal, but she had difficulty standing on either foot. (*Id.*). Dr. Kosmides assessed Ms. Collins with a concussion, cervical strain/sprain, and some paresthesia and recommended she increase her dose of Wellbutrin, continue using over-the-counter medications for pain, and start physical therapy. (Tr. 497). Ms. Collins declined the offered prescription for a muscle relaxant. (*Id.*).

That same day, Ms. Collins presented for her annual physical examination. (Tr. 494-96). She reported the motor vehicle accident and described pain, tingling in her fingers and arms, headaches, and a concussion. (Tr. 494). She endorsed limited activity after the accident. (*Id.*).

Physical examination was normal. (Tr. 495-96). She received refills for levothyroxine (Synthroid), gabapentin (Neurontin), and bupropion XL (Wellbutrin XL). (Tr. 496).

On December 3, 2019, Ms. Collins attended a physical therapy evaluation. (Tr. 490-93). There, she described improving gait and balance since the accident, bilateral suboccipital pain radiating to the shoulders, and bilateral numbness and tingling in the hands. (Tr. 491). She reported functional limitations with walking in the community, heavy exertion, lifting, physical activity, and recreational activity. (*Id*.). On examination, Ms. Collins had diminished cervical range of motion, a positive NEER test of the left shoulder, diminished left grip strength, and decreased gait cadence. (Tr. 492).

On December 4, 2019, an MRI of the cervical spine showed straightening of usual cervical lordosis, degenerative spurring at the atlantodental joint, limited cerebral spinal fluid space surrounding the spinal cord at C3-C4 through C6-C7 without gross compression or abnormal cord signal, disc bulging at C3-C4 through C6-C7 with flattening and indentation of the ventral thecal sac at C5-C6 and C6-C7, and mild to moderate left foraminal narrowing at C5-C6 related to chronic bony degenerative change. (Tr. 570-72).

On December 11, 2019, Ms. Collins attended physical therapy and demonstrated increased neck and shoulder range of motion. (Tr. 488). She reported continued numbness and tingling in her hands, bilateral suboccipital pain, and left-sided neck and shoulder pain. (*Id*.). The following week at physical therapy, Ms. Collins demonstrated improved neck pain. (Tr. 486). She did not have a headache yet that morning but described typical pain at the base of her skull and across her forehead that worsens as the day progresses. (Tr. 487).

On December 26, 2019, Ms. Collins attended another physical therapy session and reported increased neck and shoulder range of motion and strength. (Tr. 485). She continued to have pain but was able to maintain a high activity level without increased symptoms after treatment. (*Id.*). Ms. Collins denied current headaches and dizziness. (*Id.*).

On January 2, 2020, Ms. Collins returned to physical therapy and reported decreased neck pain, dizziness, and headaches, but endorsed difficulty with focus when reading. (Tr. 483). She denied post-treatment pain. (*Id.*).

On January 8, 2020, Ms. Collins attended another physical therapy session and exhibited improved neck and shoulder range of motion and activity levels, but continued to be limited with heavy exertion, lifting, physical activities, and recreational activities. (Tr. 480-81). Ms. Collins stated she returned to work as a teacher after the holiday break and experienced increased symptoms with prolonged reading and computer use. (Tr. 481).

At her next physical therapy session on January 15, 2020, Ms. Collins displayed good balance with new exercises but reported limited tolerance for reading and computer use. (Tr. 477-78). On January 22, 2020, the physical therapist noted Ms. Collins demonstrated good balance, excellent neck and shoulder range of motion, and good posture. (Tr. 476). She denied having neck pain or headaches. (*Id.*).

On January 29, 2020, Ms. Collins demonstrated good exercise technique during her physical therapy session. (Tr. 474). She denied neck pain but reported a headache for two days and noted that prolonged reading, writing, computer use, and bright lights trigger her headaches. (*Id.*).

On February 12, 2020, Ms. Collins exhibited increased range of motion and strength and reported decreased pain and headaches. (Tr. 472). She endorsed continued limitations with physical activity, recreational activity, working, and concentration. (*Id.*).

On February 26, 2020, Ms. Collins attended physical therapy and demonstrated difficulty with walking while turning her head and with balance exercises with her eyes closed. (Tr. 470). She reported no headaches or dizziness for two weeks and endorsed some imbalance with daily activities and issues with concentration while reading or using a computer. (*Id.*).

On March 16, 2020, Ms. Collins returned for another physical therapy session and demonstrated decreased balance but improved neck and shoulder range of motion and improved upper extremity strength. (Tr. 467). Ms. Collins reported occasional headaches and dizziness as well as limitations with heavy exertion, reading, using a computer, physical activity, and recreational activity. (Tr. 467-68).

On April 16, 2020, Ms. Collins met with Dr. Kosmides and reported feeling "much improved"; she described doing stairs all day long without issue, though she continued to experience blurred vision with reading. (Tr. 454). Physical and mental status examinations were normal. (Tr. 454-55). Dr. Kosmides directed her to return to his office in three to six months. (Tr. 454).

On November 10, 2020, Ms. Collins returned to Dr. Kosmides and complained of blurry vision after reading for 20 minutes. (Tr. 452). She described changing her teaching style  to accommodate her limitation. (*Id.*). She denied worsening headaches, claiming they occur if she forces herself to squint, but peppermint helps relieve them. (*Id.*). Dr. Kosmides referred her for cognitive rehabilitation. (*Id.*).

6

On November 19, 2020, Ms. Collins met with Lynn Jedlicka, M.D. for a traumatic brain injury rehabilitation evaluation. (Tr. 447-51). There, Ms. Collins reported her initial injuries from the accident largely resolved but she had residual left shoulder and elbow pain and continued blurred vision after reading for about 30 minutes. (Tr. 447). She described occasional headaches with prolonged reading and endorsed comprehension and focus issues. (*Id.*). On examination, Ms. Collins was free of cranial nerve deficits and her high-level abstract processing, judgment, and recall were intact. (Tr. 449). Otherwise, she had limited left shoulder abduction. (*Id.*). After examination and review of Ms. Collins's medical history, Dr. Jedlicka determined the blurred vision, decreased focus, and headaches were "likely due to visual fatigue rather than of central cognitive origin," and referred her to a neuro-ophthalmologist for evaluation. (*Id.*). In addition, Dr. Jedlicka referred Ms. Collins to a speech pathologist for rehabilitation of cognitive linguistic skills and, noting "some evidence of adjustment disorder," referred her to a psychologist "for cognitive behavioral therapy to help develop her coping skills." (*Id.*). Finally, for persistent left shoulder pain, she referred Ms. Collins for more physical therapy "to improve function and stability of the joint." (*Id.*).

On December 2, 2020, Ms. Collins returned to the eye doctor and complained of mild blurred vision. (Tr. 597). She described trouble with depth perception, compromised near vision with fatigue after reading for 25 to 30 minutes, and headaches. (*Id.*). Dr. Vincent recommended new glasses and taking breaks with near work to reduce headaches and eyestrain. (Tr. 599).

That same day, an MRI of the left shoulder revealed mild tendinosis in the supraspinatus, infraspinatus, and subscapularis tendons, mild hypertrophic degenerative changes in the acromioclavicular joint, reactive subcortical cystic changes at the greater tuberosity, and mild bursal

distention in the subdeltoid/subacromial bursa. (Tr. 553-55). The interpreting physician determined the imaging was consistent with rotator cuff tendinosis and mild subdeltoid/subacromial bursitis. (Tr. 557).

On December 15, 2020, Ms. Collins attended a speech and language therapy evaluation for concentration difficulties. (Tr. 440). On assessment, the evaluator noted Ms. Collins "maintains attention with simple living activities with occasional minimal cues within distracting environments. [She] requires increased cuing to start, continue, and change attention during complex activities," and Ms. Collins could "recall or use external aids/memory strategies for complex information and planning complex future events most of the time. When there is a breakdown in the use of recall/memory strategies/external memory aids, [she] occasionally requires minimal cues. These breakdowns may occasionally interfere with [her] functioning in vocational, avocational, and social activities." (Tr. 441). Ms. Collins attended additional speech and language therapy treatments on December 23 and 30, 2020. (Tr. 437-38).

On January 6, 2021, at physical therapy, Ms. Collins demonstrated increased left shoulder range of motion and reported having no pain. (Tr. 435-36). That same day, during speech and language therapy she reported no complaints. (Tr. 434). She endorsed using the memory strategies learned in previous sessions, and during therapy she could comprehend and recall key details of written information with minimal cuing. (Tr. 434-35).

On January 13, 2021, Ms. Collins returned for speech and language therapy and reported a headache and eye fatigue. (Tr. 433).

On January 14, 2021, Ms. Collins met with Dr. Jedlicka for a follow-up appointment and described her shoulder, hip, and leg pain as "much better" with physical therapy. (Tr. 430). She

complained of continued blurry vision and easy distraction but noted her new corrective lenses help. (*Id.*). Dr. Jedlicka discussed slowly increasing the amount of time she spent reading to increase her tolerance for additional eye activity and suggested a muscle relaxer and a stimulant, such as amantadine or Provigil, for concentration. (Tr. 432).

On July 29, 2021, Ms. Collins returned to her family physician, Victoria Brobbey, M.D., for a routine evaluation. (Tr. 425-29). There, she described blurry vision after 25 minutes of reading that lasts the rest of the day, difficulty watching screens for more than 45 minutes, diminished attention span, a pulling sensation on the side of her head, and feeling fatigued sooner than usual. (Tr. 425-26).

On August 9, 2021, Ms. Collins's counselor provided a case summary indicating she attended six counseling sessions for chronic depression and social anxiety disorder during March and April 2020. (Tr. 392). The counselor recommended Ms. Collins reduce from full-time work to part-time work and continue physical therapy and use relaxation techniques to return to her previous level of function. (*Id.*). The counselor noted, "[a]s of this date, I am unaware of Paula's current level of functioning. It is difficult for me to determine if she is able to concentrate, carry out instructions, or respond to pressure of the workplace." (*Id.*).

On December 6, 2021, Ms. Collins returned to Dr. Vincent's office and complained of moderate blurred vision, reporting she can read for 25 minutes before her vision gets blurry. (Tr. 593). She also described waking up with blurry vision on some days. (*Id.*). Dr. Vincent referred Ms. Collins for a traumatic brain injury evaluation. (Tr. 595).

On December 16, 2021, Ms. Collins returned to Dr. Jedlicka's office and complained of continued blurry vision, intermittent dizziness about once a week, feeling easily fatigued, and

spasms in her scalp and neck. (Tr. 417). She reported her new corrective lenses improved her blurry vision and physical therapy helped relieve her left-sided shoulder and elbow pain. (Tr. 419). She stopped taking the muscle relaxer because it made her too sleepy. (Tr. 417). Dr. Jedlicka prescribed Provigil for concentration and fatigue and Flexeril as an alternative muscle relaxer. (Tr. 420).

### III.    Medical Opinions

On April 14, 2021, Ms. Collins attended a consultative examination with Chanelle Shamoun, M.D. (Tr. 397-99). There, she explained her medical history since the auto accident, including blurred vision after 25 minutes of reading and headaches after 30 to 40 minutes of watching a screen. (Tr. 397). She also described taking significantly longer to learn new things, needing to sleep for two to three hours after any sort of activity involving focus and concentration, writing things down in order to remember, and requiring increased help from her husband since the accident. (*Id.*). She endorsed left shoulder pain with physical activity. (*Id.*). Ms. Collins cannot hike anymore and, on bad days, cannot walk more than one block. (*Id.*). She can carry 10 pounds at most, sit for 45 minutes before readjusting, and stand for 45 minutes before becoming severely fatigued. (*Id.*). Ms. Collins also explained she used to be a teacher but stopped working because she needed significant help from colleagues to grade student work and, when school went virtual, she could not tolerate the online work and significant screen time. (*Id.*). She was tearful throughout the evaluation. (Tr. 398).

Physical examination was normal except she had mild left shoulder tenderness with palpation and diminished range of motion with left shoulder abduction, flexion, and extension.

(Tr. 398-99). Neurological examination was normal except for slightly diminished left shoulder strength. Based on the interview and examination, Dr. Shamoun opined as follows:

> The claimant is a 53-year-old woman who sustained a motor vehicle accident in 2019. She had no difficulties working prior but ever since her accident she has had significant issues with cognitive function limiting her ability to read, focus and concentrate and has limited her ability to be a teacher as such. She can pick up approximately 10 pounds. She believes she can sit for about 45 minutes comfortably. She can stand for only 45 minutes without becoming fatigued and can only walk approximately one block. At this point I believe the claimant could perform a sedentary level of work.

(Tr. 399).

On September 17, 2021, Ms. Collins attended a consultative psychological evaluation with Gary Sipps, Ph.D. (Tr. 406-11). There, she claimed she cannot work because overexertion aggravates her left knee, left hip, and left foot pain, she gets blurred vision after 25 minutes of reading, and she has headaches. (Tr. 407). Ms. Collins endorsed cooking healthy meals, cleaning dishes, doing laundry, vacuuming, talking with friends on the phone, working on small furniture projects with her husband, and spending time with her granddaughter about once a week. (Tr. 407-08). She used to enjoy hiking but now becomes easily fatigued and cannot walk up hills. (Tr. 408).

Ms. Collins presented with a subdued affect but conveyed herself clearly and coherently without indication of aphasia. (Tr. 408). She described variable sleep patterns, extremely low energy, crying spells, irritability, and agitation since the auto accident. (*Id.*). She presented with overt signs of anxiety, including persistent and perseverative foot movements, intermittent breathing and visible signs of tension, award gestures, frequent sighs, and tearfulness. (Tr. 409). Based on sensorium and cognitive function testing, Dr. Sipps felt Ms. Collins was functioning "in the upper end of the average range of adult intellectual disability." (*Id.*).

11

Dr. Sipps determined Ms. Collins was not limited in understanding, remembering, and carrying out instructions, performing simple tasks, or responding appropriately to supervision and to coworkers in a work setting. (Tr. 410-11). Based on her complaints of blurred vision and headaches resulting in impaired concentration, Dr. Sipps felt Ms. Collins appeared limited in her abilities to maintain concentration, attention, persistence, and pace in the performance of multi-step tasks and to respond appropriately to typical and expected work pressures. (Tr. 411).

On August 19, 2021, State agency medical consultant Lynn Torello, M.D., reviewed Ms. Collins's medical records and determined she can occasionally lift and carry 20 pounds, 10 pounds frequently; occasionally push and pull with the left arm; stand and/or walk 6 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday; never climb ladders, ropes, or scaffolds; occasionally stoop and crawl; and occasionally reach overhead with the left arm. (Tr. 65-66). Dr. Torello explained the exertional, postural, and manipulative limitations were provided in light of Ms. Collins's history of traumatic brain injury and left shoulder pain with decreased range of motion and diminished strength. (Tr. 65). On January 21, 2022, State agency medical consultant Douglas Chang, M.D., determined the updated medical records were consistent with the findings on initial evaluation. (Tr. 78).

On October 12, 2021, State agency psychological consultant Kristen Hawkins, Psy.D., reviewed Ms. Collins's medical records and determined she is moderately limited in her ability to maintain attention and concentration for extended periods of time, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get

along with coworkers without distracting them, and respond appropriately to changes in the work setting. (Tr. 67). As such, Dr. Hawkins determined Ms. Collins can perform short cycle work that does not require adherence to strict deadlines or production quotas, interact with others superficially in the work setting, adjust to minor changes in the work setting independently, and adjust to major changes in the work setting if introduced in advance to allow for adjustment to new expectations. (*Id.*). On January 19, 2022, State agency psychological consultant Irma Johnston, Psy.D., determined the updated medical records were consistent with the findings on initial evaluation. (Tr. 74).

## IV. Administrative Hearing

At the administrative hearing, Ms. Collins testified she stopped working as a high school English teacher the school year after her auto accident. (Tr. 42). Immediately after the accident, she became sensitive to light and noise, had blurred vision for extended periods of time after reading for 25 minutes, experienced headaches and fatigue from squinting, and relied on assistance from colleagues to help grade student papers. (Tr. 41-42). Ms. Collins felt so mentally, physically, and emotionally fatigued by the end of the school day that she would nap for two or three hours at home. (Tr. 42). She also described issues with memory and endorsed making lists for reminders. (*Id.*). Those symptoms did not get better after the accident. (Tr. 43). She continues to experience blurred vision, eyestrain headaches or migraines two to three times a week, and fatigue. (Tr. 43-44). When she has a migraine she drinks tea, uses peppermint oil, and shuts herself in a dark room to sleep. (Tr. 44). Eyestrain headaches are not as bad as migraines, but they keep her in bed for about two hours. (Tr. 45). After a headache, Ms. Collins experiences mental fog and takes longer to comprehend. (Tr. 51). She becomes dizzy when bending over and climbing stairs.

(*Id.*). Ms. Collins does not take prescription medication for her headaches because she experienced significant gastrointestinal side effects and sleepiness when she tried migraine medications in her 20s. (Tr. 52).

On a typical day, Ms. Collins wakes around 8:30 or 9:00 a.m. and takes care of anything that needs to be done upstairs before going downstairs for breakfast. (Tr. 46). She prays, does meditation, and does the breakfast dishes. (Tr. 47). She usually makes lunch for her and her husband and, if she is having a good day, will do some chores around the house such as vacuuming or laundry, or go to the grocery store. (*Id.*). She drives but becomes fatigued after about 45 minutes. (*Id.*). Her 7-year-old granddaughter visits overnight once a week but Ms. Collins's husband is around to entertain her if Ms. Collins gets tired or has a headache. (Tr. 48).

Ms. Collins also has residual left shoulder dysfunction, including weakness, pain, and easy fatigue, making it difficult to lift anything more than 10 pounds or carry anything for an extended distance. (Tr. 50).

The VE testified that a person of Ms. Collins's age, education, and experience, with the functional limitations described in the ALJ's residual functional capacity (RFC) determination, could not perform past relevant work as a high school teacher but could perform unskilled jobs including packager, garment sorter, and cleaner. (Tr. 55-56). The VE also stated employers tolerate off-task behavior up to 10% of the workday and one absence per month. (Tr. 56-57).

## V.     Other Relevant Evidence

Ms. Collins completed an Adult Function Report indicating how her conditions affect her ability to work. (Tr. 201-08). Her eyes become blurry after reading for 25 minutes, she gets headaches and blurry vision after watching a screen for about the same amount of time, and

fatigues much easier than she previously did. (Tr. 201). She struggles with memory, concentration, and learning new things. (*Id.*). She cannot lift more than 10 pounds and gets lightheaded if she bends over too much. (Tr. 206). She has memory issues and must write everything down. (*Id.*). She can walk about a mile before needing to rest for 5 to 10 minutes and can pay attention for 25 to 30 minutes at a time. (*Id.*). Ms. Collins becomes easily frustrated and does not handle stress well. (Tr. 207).

Ms. Collins's typical day begins around 9:00 or 9:30 a.m. (Tr. 202). She showers, waits for her eyes to adjust, and does daily chores and meal prep as needed. (*Id.*). She tries to walk outside a couple times a week and goes to sleep around 10:00 p.m. (*Id.*). Before the accident, she could teach full time, read for work and pleasure, and workout daily. (*Id.*). Now, she needs frequent breaks while doing small chores. (*Id.*).Ms. Collins enjoys watching movies, spending time with friends, meditating, singing, and playing with her granddaughter but her attention span is much shorter, and she is easily fatigued and frustrated. (Tr. 205).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters,* 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Collins meets the insured status requirements of the Social Security Act through December 31, 2025 and had not engaged in substantial gainful activity since June 6, 2020, the alleged onset date. (Tr. 19). At Step Two, the ALJ identified the following severe impairments: cervical spine degenerative disc disease, headaches, left shoulder bursitis/tendinitis, status post concussion due to motor vehicle accident, major depression, social anxiety disorder, and adjustment disorder. (*Id.*).

At Step Three, the ALJ found Ms. Collins does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Tr. 20).

16

Specifically, the ALJ considered Listings 1.15 and 1.16 (both relating to spine disorders), 1.18 (abnormality of a major joint), 11.02 (epilepsy), 11.18 (traumatic brain injury), 12.04 (depressive, bipolar, and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders) and found Ms. Collins did not meet the criteria of any listing. (Tr. 23). The ALJ determined Ms. Collins's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional stooping, kneeling, and crawling; occasional overhead reaching bilaterally; avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery; no commercial driving; limited to the performance of simple, routine work involving no more than simple work-related decision making; no arbitration, negotiation, or confrontation; no directing the work of others or being responsible for the safety or welfare of others; no assembly line work; occasional interaction with others; and workplace changes should be gradual and explained in advance.

(Tr. 21).

At Step Four, the ALJ found Ms. Collins cannot perform her past relevant work. (Tr. 25). At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that Ms. Collins can perform, including packager, garment sorter, and cleaner. (Tr. 26). Therefore, the ALJ found Ms. Collins was not disabled. (Tr. 27).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v.*

*Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial

evidence is more than a scintilla of evidence but less than a preponderance and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of

Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of

evidence evaluation does not permit a selective reading of the record. Substantiality of evidence

must be based upon the record taken as a whole. Substantial evidence is not simply some evidence,

or even a great deal of evidence. Rather, the substantiality of evidence must take into account

whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x

636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial

evidence, the court does not review the evidence de novo, make credibility determinations, or

weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's

position, the court cannot overturn "so long as substantial evidence also supports the conclusion

reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so

because there is a "zone of choice" within which the Commissioner can act, without fear of court

interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d

1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by

substantial evidence, the Court must determine whether proper legal standards were applied. The

failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports

the ALJ's decision, the court must overturn when an agency does not observe its own regulations

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## DISCUSSION

Ms. Collins claims the ALJ did not properly evaluate her symptoms in accordance with the regulations and Social Security Ruling (SSR) 16-3p.[1] (ECF #7 at PageID 639). More specifically, she argues the ALJ failed to consider all the relevant factors set forth in SSR 16-3p and mischaracterized the extent of her activities. (*Id.* at 641). The Commissioner contends the ALJ applied the correct legal standards and identified substantial evidence supporting his evaluation of Ms. Collins's symptoms. (ECF #8 at PageID 661).

A claimant's RFC is defined as the most a claimant can still do despite the physical and mental limitations resulting from his impairments. 20 C.F.R. § 404.1545(a). The ALJ alone

---

[1] Ms. Collins also takes issue with the ALJ's findings on the persuasiveness of the medical opinions. (*Id.* at PageID 644). Because Ms. Collins's argument on this issue is underdeveloped, perfunctory, and offers little by way of legal analysis, I conclude it is unnecessary to address this assertion. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation omitted).

19

determines a claimant's RFC. *Id.* at § 404.1546(c). The RFC must be based on all relevant evidence in the record, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. *Id.* at § 404.1545(a); *see also Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010).

An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* In other words, the RFC assessment is based on the evidence of record and the ALJ's evaluation of the consistency of the claimant's statements regarding symptoms, *i.e.*, the SSR 16-3p analysis.

SSR 16-3p outlines a two-step process for the ALJ to follow when evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.*

At the second stage, recognizing that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence, the ALJ considers the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case. *Id.* In addition, the ALJ uses the factors set forth in 20 C.F.R. § 404.1529(c)(3) to evaluate the individual's statements:

1. A claimant's daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors, only those germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints and may discount subjective testimony when the ALJ finds those complaints are inconsistent with objective medical

and other evidence. *Jones*, 336 F.3d at 475-76. However, the ALJ will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. SSR 16-3p, at *5. Similarly, the ALJ may not reject an individual's statements about his symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged but must carefully consider other evidence in the record. *See* 20 C.F.R. § 404.1529(c)(2); *see also* SSR 16-3p, at *6. Statements about pain or other symptoms will not alone establish that an individual is disabled. 20 C.F.R. § 404.1529(a) ("There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.").

The ALJ must explain which of an individual's symptoms are consistent or inconsistent with the evidence of record and how the ALJ's evaluation of the symptoms led to his conclusions. SSR 16-3p, at *9. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. The ALJ must limit his evaluation "to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments." *Id.* at *11. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17

(N.D. Ohio Aug. 4, 2021). In reviewing an ALJ's evaluation of an individual's symptoms, the court is limited to evaluating whether the ALJ's explanations for discrediting an individual's testimony are reasonable and supported by substantial evidence in the record. *Jones*, 336 F.3d at 476.

Here, the ALJ considered the following:

> The claimant alleges disability due to her physical and mental impairments. At the hearing, the claimant testified that she cannot work primarily due to back pain and the effects of a concussion/motor vehicle accident. She indicated that after sustaining a concussion, she experienced sensitivity to loud sounds, dizziness, headaches, fatigue, and difficulty remembering things. According to the claimant, she is unable to read for more than 25 minutes at a time before experiencing blurry vision followed by a headache, and her headaches are worse when reading a screen. The claimant further alleged that her headaches occur two to three times per week, she has a migraine once per week, her migraines last an hour to four hours, and she relieves them by going into a dark room and sleeping. Regarding mental impairments, the claimant testified that she suffers from depression and anxiety, and she took psychiatric medications such as Wellbutrin for the past 20 years, without any side effects. The claimant stated that she is not currently involved with counseling services, and she previously tried counseling and cognitive behavioral therapy, but they were not helpful. Regarding activities of daily living, the claimant testified that she has a driver's license and is able to drive, and she currently lives with her husband. Finally, she said that on a typical day, she makes breakfast, does meditation, completes household chores such as vacuuming or laundry, goes grocery shopping alone, and babysits her seven-year-old granddaughter overnight once per week.

(Tr. 22). After summarizing Ms. Collins's medical records, the ALJ concluded as follows:

> The claimant's allegations are determined to be less than fully consistent with the evidence. The nature and degree of pain and functional limitations alleged by the claimant is not supported by medical and non-medical sources. Diagnostic test results and physical examination findings have been largely unremarkable, the claimant saw significant improvement following her motor vehicle accident in 2019, and she had a mostly conservative treatment history for her physical health impairments since the alleged onset date such as pain medications and physical therapy sessions. For example, a physical examination performed in December of 2021 revealed that she was alert and oriented to all spheres, her gait was normal, she did not use an assistive device, her cranial nerves were intact, her language was normal, and dysphagia was absent. Moreover, the claimant engages in a variety of daily activities that indicate a greater level of functioning than alleged. For example, she testified that she drives, and on a typical day, she makes breakfast, does meditation, completes household

chores such as vacuuming or laundry, goes grocery shopping alone, and babysits her seven-year-old granddaughter overnight once per week.

Regarding the consistency of the claimant's mental health allegations, she had a limited treatment history since the alleged onset date, without evidence of psychiatric hospitalization in the record, and she is not currently receiving counseling services. Such absence of documentation of ongoing treatment is inconsistent, and it seriously undermines allegations of disabling, or even severe, limitations of function, lasting twelve months in duration, and despite treatment. Additionally, the claimant reported mostly mild to moderate symptoms to providers and during her psychological consultative examination with Dr. Sipps, without evidence of hallucinations, delusions, obsessions, compulsions, current suicidal/homicidal ideation, or other serious issues. Thus, there are no indications in the medical record limitations beyond the performance of light level work with the non-exertional restrictions listed above.

(Tr. 23-24). According to Ms. Collins, the ALJ's evaluation is not supported by substantial evidence because he did not consider all relevant factors, mischaracterized her daily activities, and determined her symptoms significantly improved even though she continued to have blurry vision and headaches. (ECF #7 at 641-43).

Here, regarding the relevant factors under 20 C.F.R. § 404.1529(c)(3), the ALJ explicitly considered Ms. Collins's daily activities; the location, duration, frequency and intensity of her headaches and pain; the treatment she receives; and other measures she uses to treat her symptoms. Ms. Collins claims the ALJ "fail[ed] to consider the nature of [her] impairments i.e., that she has good and bad days, and that her activities are limited by her fatigue, need for breaks, and differ on the days when she has a headache[.]" (ECF #7 at PageID 643). But, as noted above, the ALJ expressly considered Ms. Collins's statements about her symptoms, including that she has two to three headaches a week brought about by reading for 25 minutes and a migraine once a week that lasts one to four hours and determined her statements were inconsistent with the largely

unremarkable diagnostic tests and physical examinations, her own claimed improvement with treatment, the conservative treatment she pursued, and her daily activities.

Regarding daily activities, Ms. Collins claims the ALJ's analysis was "selective," and failed to consider the limited nature of the activities described (*id.* at PageID 644), but she offers no elaboration on this argument or describe how the ALJ mischaracterized the extent of her activities. *See Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 248-49 (6th Cir. 2007) (finding an ALJ's use of plaintiff's daily activities to question her credibility was inappropriate because the ALJ mischaracterized the plaintiff's testimony regarding the scope of her daily activities). As the regulations advise the ALJ to consider an individual's daily activities when evaluating an individual's symptoms and Ms. Collins has not shown the ALJ mischaracterized her activities, I find no error here. *See* 20 C.F.R. § 404.1529(c)(3).

Last, Ms. Collins takes issue with the ALJ's finding of significant improvement, noting she continued to complain of blurred vision and subsequent headaches with no improvement. The medical records on which the ALJ relied belie Ms. Collins's argument. At her most recent medical appointment with Dr. Jedlicka, Ms. Collins explicitly reported that her blurry vision remained an issue but had improved with new corrective lenses and physical therapy improved her mild left shoulder and elbow pain. (Tr. 419-20).

I conclude the ALJ appropriately considered the entire record, including the relevant factors identified in 20 C.F.R. § 404.1529(c)(3), and substantial evidence supports the ALJ's conclusion that Ms. Collins's statements about her symptoms were inconsistent with the objective medical evidence and other evidence in the record. As such, Ms. Collins has not identified any error justifying remand.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: May 7, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).